# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-3899

_____

Lee M. Simmons

*Plaintiff - Appellant*

v.

Paul Daniel Smith,[1] in his official capacity as Acting Director of the National Park Service; Ryan Zinke, in his official capacity as Secretary of the United States Department of the Interior; United States of America

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 14, 2017
Filed: April 30, 2018

_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

--------------

[1]Paul Daniel Smith is automatically substituted pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Lee M. Simmons appeals the decision of the district court[2] granting summary judgment in favor of the National Park Service (NPS). Simmons argues that NPS violated § 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706, in establishing the boundaries of the Niobrara Scenic River Area (NSRA), both generally and with respect to his property. Simmons further argues that NPS violated the APA by treating him differently than his neighbors and acting in bad faith.

## I.

The Niobrara River runs through northern Nebraska before flowing into the Missouri River along the border between Nebraska and South Dakota. In 1991, Congress enacted the Niobrara Scenic River Designation Act, Pub. L. No. 102-50, 105 Stat. 254 (codified in relevant part at 16 U.S.C. § 1274(a)(117)), which amended the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. §§ 1271–87, to place certain portions of the Niobrara under the administration of the Secretary of the Interior. Congress further directed the Secretary, "[a]fter consultation with State and local governments and the interested public," to "establish detailed boundaries" for the NSRA. 16 U.S.C. § 1274(a)(117), (b). The Secretary delegated this authority to NPS. By statute, "prior to the publication of boundaries" pursuant to § 1274(b), the preliminary boundaries were established at "one-quarter mile from the ordinary high water mark on each side of the river." Id. § 1275(d). These "[p]rovisional boundaries remain[ed] in place until amended by the action of the administering agency." Sokol v. Kennedy, 210 F.3d 876, 877 n.3 (8th Cir. 2000). However, that default does not "limit the possible scope of the study report to address areas which may lie more than one-quarter mile from the ordinary high water mark on each side of the river." 16 U.S.C. § 1275(d).

---

[2]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

Simmons owns land on the banks of the Niobrara. In the instant case, we are concerned particularly with his land on the north side of the river in what is called the Sparks Quadrant. Among other things, Simmons uses his land to operate a recreational outfitter business—called Niobrara River Ranch—which offers both canoeing and lodging. Simmons's land is situated directly downriver from the Berry Bridge, a major launch point for boats on the Niobrara, and includes both a large stand of ponderosa pines and substantial river "viewshed"—a term that refers to the area that is visible to a canoeist paddling down the river. Because Simmons's land is on the bank of the Niobrara, the preliminary boundary for the NSRA included a substantial portion of his property, namely all of the property within one-quarter mile of the river. Simmons has an interest in determining how much of his land falls within the final boundary determined by NPS, because the WSRA places limitations on certain projects and the use of land that falls within a designated area. See 16 U.S.C. §§ 1278, 1281(a), 1283.

In 1992, NPS began the process of creating a General Management Plan (GMP) that articulated detailed, specifically-tailored boundaries for the NSRA. This process lasted over four years, and, in 1996, NPS promulgated its final boundary designation. This boundary was challenged by David Sokol, another landowner on the Niobrara (who is not a party in the instant litigation). After the district court granted summary judgment to NPS in that case, Sokol appealed to this court, and we reversed. We held that the standard used by NPS in its decision making did not satisfy the WSRA's declaration of policy. Sokol, 210 F.3d at 879. That provision of the statute explains:

> It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments

-3-

shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271. In light of that statutory language, we held that the boundaries of the NSRA had to be drawn in such a way as to "protect and enhance the outstandingly remarkable values that caused the Niobrara River area to be included in the [Wild and Scenic River] System." Sokol, 210 F.3d at 879. We found that NPS had acted in violation of its statutory mandate by focusing on protecting merely "significant" and "important" values, and we remanded the case with instructions that "the Park Service should select boundaries that seek to protect and enhance the outstandingly remarkable values of the Niobrara Scenic River Area." Id. at 879–81.

NPS started over. They engaged in a second boundary-drawing process, led by Paul Hedren, the NPS Superintendent of the Niobrara. This process began in 2000 and involved public meetings, conversations with local landowners and other stakeholders, and the compilation of scientific evidence. Throughout the process, in accordance with our opinion in Sokol, NPS sought to identify those aspects of the Niobrara that qualified as outstandingly remarkable values (ORVs) and to draw boundaries accordingly. NPS made extensive ORV findings, noting the presence of five types of ORVs in the NSRA: scenic, recreational, geologic, fish and wildlife, and paleontological (in the "other" category). See 16 U.S.C. § 1271. NPS also concluded that the historic and cultural values of the river—while interesting and important—were not outstandingly remarkable. See id.

NPS identified two of these ORVs—recreational and paleontological—only in specific locations. A number of recreational values were enumerated including canoeing, kayaking, and tubing. For paleontological values, NPS noted that the river had been called "the best bone hunter's river in the world" and identified 15 internationally significant fossil sites, 37 nationally significant sites, and 106 regionally significant ones. These values were found to exist in discrete locations

-4-

throughout the region. But the other three ORVs—scenic, geologic, and fish and wildlife—were found to exist more broadly. For scenic values, NPS determined that the designated section of the Niobrara "retains a timeless natural character with a splendid and nationally recognized mixing of distinct ecosystems, some at their farthest continental range." Its finding on geologic values was based on the uniqueness and abundance of the Niobrara Valley's varied waterfalls and the "inextricable links to the river's flora, fauna, and paleontology" that its geological features foster and enhance. As to fish and wildlife, NPS noted that the Niobrara Valley possesses a "profusion of habitats and animal species" that are an "outstanding example of Great Plains biological diversity," that this diversity fosters "hybridization and evolution," and that portions of the river are "potential critical habitat[s] for several threatened or endangered species." Thus, NPS determined that these three values existed "rim to rim" across the designated section of the river, encompassing over 150,000 acres of the Niobrara Valley.

On the basis of these ORV determinations, the draft GMP laid out three "boundary alternatives." Boundary Alternative 1 represented the preliminary boundary created by the statute. It was not preferred by NPS, among other reasons, because it was "not tailored to provide maximum protection to the most outstandingly remarkable values." Boundary Alternative 2 was drawn to favor scenic and paleontological values specifically, with a diminished focus on the other values. This boundary was not preferred, but NPS noted that it did "meet congressional intent for Wild and Scenic river protection." Boundary Alternative 3—NPS's preferred boundary line—focused on protecting all five of the identified ORVs "as equitably as possible" and, therefore, also satisfied congressional intent.

In the process of drafting and modifying these boundary alternatives, NPS consulted a wide range of organizations with interests in the Niobrara Valley. In 2001, NPS made presentations to many of these groups and revised the GMP

(including the boundary alternatives) based on the suggestions received. In 2002, NPS made further revisions and alterations based on feedback after public review. This process stretched into January 2003. On January 9, 2003, the location of Boundary Alternative 3 on Simmons's land was altered to include approximately 25 additional acres on the North bank of the Niobrara in the Sparks Quadrant. Boundary Alternative 3—as relevant to this appeal—underwent no further changes, and NPS selected this Alternative as the final boundary for the NSRA. In 2005, NPS published notice of the draft GMP providing a 60-day window for public comment. NPS responded to all of the comments it received (including those submitted by Simmons) when it promulgated the final GMP in February 2007.

Simmons filed various written objections to the NPS boundary (both generally and as to the boundary specifically on his property) in 2005, 2007, and 2012. When his comments did not cause NPS to alter the boundary, Simmons filed this lawsuit in 2013, challenging NPS's decision-making process under the APA. Both parties sought summary judgment. On all but one claim,[3] the district court granted summary judgment to NPS, concluding that the boundary-line alterations challenged by Simmons were not arbitrary or capricious, and that NPS had not acted in bad faith or subjected Simmons to differential treatment. Simmons appeals that ruling.

---

[3]As to the one claim on which Simmons was granted summary judgment—relating to an entirely different parcel of land—the district court held that "[a]bsent any showing that the boundary change was made for the purpose of protecting and enhancing the oustandingly remarkable values of the Niobrara Scenic River Area, as opposed to maintaining the Area's acreage at a certain number, . . . NPS's action was arbitrary and capricious." NPS has not appealed that ruling.

## II.

"We review de novo a district court's decision on whether an agency action violates the APA." Friends of the Norbeck v. U.S. Forest Service, 661 F.3d 969, 975 (8th Cir. 2011). As relevant here, we may set aside agency action under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Sokol, 210 F.3d at 878. "An agency decision is arbitrary or capricious if: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Parks Conserv. Ass'n v. McCarthy, 816 F.3d 989, 994 (8th Cir. 2016) (quoting Lion Oil Co. v. EPA, 792 F.3d 978, 982 (8th Cir. 2015)). "Under this narrow standard, a court is not to substitute its judgment for that of the agency, yet the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts and the choice made." Id. (internal quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 43 (1983)). Similarly, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 844 (1984).

## III.

Simmons first challenges NPS's determination of ORVs, arguing that the conclusion reached by NPS regarding the scope of scenic, geologic, and fish and wildlife ORVs is not consistent with our opinion in Sokol. Simmons does not dispute the scientific data or NPS's expertise in this area. Instead, he argues, NPS acted impermissibly in concluding that these ORVs extend from rim to rim across the

Niobrara Valley. First, Simmons asserts that these specific ORV determinations are incompatible with Sokol. Second, he argues, more broadly, that an ORV of any type cannot exist from rim to rim across an entire river valley because such an ORV finding "is the legal equivalent of finding no ORVs at all." Further, he contends that NPS did not adequately identify the specific ORVs present on his property that would justify the disputed boundary.

*A. Sokol footnote 11*

Simmons's first argument relies heavily on footnote 11 of our Sokol opinion, which admonished NPS for "selecting land . . . simply to maximize the number of acres included in the" NSRA. 210 F.3d at 881 n.11. That consideration, we explained, did not comport with the statutory requirement that NPS select land to protect and enhance the ORVs present in the river area. We went on to note that we were "particularly troubl[ed]" by "the decision to include more than 10,000 acres of 'hypothetical' viewshed, land that a canoeist on the river would see if one assumed that there were no trees or foliage on the banks." Id. This, we held, was "a massively counterfactual assumption" because "60 to 70 per cent. of the Niobrara River is screened by dense trees and foliage." Id. Based on the record before us, we commented that much of this land was "ordinary, unstriking, and apparently unnecessary to protect the scenic values of the river." Id. In short, the inclusion of this land based on its "hypothetical" scenic value to a canoeist (who would be unable to actually see it) was not in keeping with the requirement that NPS focus on protecting the actual ORVs. See id.

Simmons argues that this footnote establishes that his land does not contain scenic ORVs. But we must examine the language upon which Simmons relies in context. Sokol relied on NPS's candid admission that it had based its ORV determination—to the extent that it made one—on a hypothetical viewshed, and that its goal was not (as it should have been) ORV protection, but rather acreage

-8-

maximization. These admissions made the agency's counterfactual assumptions "particularly troubling." However, because NPS employed the wrong standard, we did not tell NPS how it should determine ORVs on remand, nor did we limit NPS's discretion to consider new information and draw new conclusions about ORVs.

When it returned to the drawing board, NPS followed Sokol. In the GMP, NPS explicitly defined the criteria it would follow in identifying ORVs of each type. For scenic ORVs, NPS used the following "Outstandingly Remarkable Criteria":

> The landscape elements of landform, vegetation, water, color, and related factors result in notable or exemplary visual features and/or attractions. When analyzing scenic values, additional factors such as seasonal variations in vegetation, scale of cultural modifications, and the length of time negative intrusions (such as power lines) are viewed may be considered. Scenery and visual attractions may be highly diverse over the majority of the river or river segment.

NPS followed these criteria in identifying the specific plant communities and forest and prairie ecosystems that combine to make the scenic values outstandingly remarkable.[4] NPS also noted the way that the scenic values overlapped and interacted with the geologic and fish and wildlife values. In short, Simmons does not identify any way that NPS's ORV identification process conflicted with our specific admonition in Sokol footnote 11, and we see none.

---

[4]NPS also had personnel canoe the entire length of the river to identify the actual, rather than hypothetical, viewshed. It appears NPS considered this in determining the locations of recreational ORVs, rather than scenic ORVs, because it represented what a recreational canoeist would actually see while canoeing down the river. We note this, nonetheless, because it is indicative of NPS's intent to address the concerns expressed in Sokol footnote 11.

## B. "Rim to rim" ORV

Simmons next argues that it is inconsistent with <u>Sokol</u>'s more central holding—that NPS had used the incorrect standard, identifying "important" and "significant" values rather than "outstandingly remarkable" ones—for NPS to assert that any ORV can be present from rim to rim across the entire 150,000-acre Niobrara Valley. Simmons reasons as follows. In <u>Sokol</u>, we rejected the notion that NPS had "complete discretion." 210 F.3d at 878–79. Instead, we held, NPS had to make the boundary determination based on the standard contained in the WSRA, namely, "to protect and enhance the outstandingly remarkable values." <u>Id.</u> at 879. Finding a rim-to-rim ORV, Simmons asserts, must therefore run afoul of <u>Sokol</u>, because, if an ORV exists from rim to rim, then NPS has complete discretion to draw the boundary. However, this argument misreads <u>Sokol</u> and misunderstands the nature of discretion granted to the agency.

As discussed above, in <u>Sokol</u>, we reversed NPS's boundary determination because the agency had not selected the land to be included on the basis of the "outstandingly remarkable values" standard required by the statute. In defending the standard that it had used, the agency argued, inter alia, that the statute left the decision entirely within its discretion. 210 F.3d at 878. We rejected this argument because, while the specific boundary-drawing provision gave no standard, NPS's argument "completely ignore[d] controlling language elsewhere in the [WSRA]." <u>Id.</u> That language required that the Niobrara (and all rivers within the Wild and Scenic Rivers System) be "administered in such manner as to protect and enhance" the ORVs that caused it to be included in the system. <u>Id.</u> (quoting 16 U.S.C. § 1281(a)).

We did not, however, go further to interpret or elaborate on how the ORV standard would apply in any particular instance. And, as a logical matter, finding the existence of one ORV from rim to rim across the entire valley is not the equivalent

-10-

of finding no ORVs whatsoever. Even after the ORVs were identified, NPS was required to use those ORV determinations when setting the actual boundaries for the NSRA. See id at 879. This was so regardless of the size of the area containing ORVs. And, as we noted in Sokol, "the [WSRA] does not require that the boundaries encompass all the outstandingly remarkable resources; this might be impossible given the acreage limitation [of § 1274(b)]." Id. Thus, we see no implied or explicit conflict between our opinion in Sokol and NPS's determination, in light of the evidence, that certain ORVs extended across the entirety of the valley.[5]

## C. Specific ORV

Simmons also argues that NPS acted arbitrarily and capriciously in setting the boundary on his property because it did not identify specific ORVs that existed in that area. We agree with Simmons's premise to a certain extent, but, based on the facts of this case, we reach the opposite conclusion. In crafting the boundaries, NPS *is* required to use the ORV determinations as a guide to decide which land should be included within the boundary in order to protect and enhance the ORVs. But we have said that NPS is "not required to include only land with outstandingly remarkable values." Sokol, 210 F.3d at 879.[6] In this case, NPS explained that Boundary

---

[5]Nor do we see any issue with an ultimate finding that an ORV might extend across the entire valley. One need only consider the case of the Grand Canyon—or one of many other singular (and large) national treasures—to recognize that an outstandingly remarkable value might exist across an expansive area.

[6]Rather, we explained,

The Park Service's duty was to establish detailed boundaries, within the acreage limits of Section 1274(b), that would protect and enhance the outstandingly remarkable values that caused the river area to be included in the Wild and Scenic Rivers System. This duty does not always bar the administering agency from including unremarkable land; indeed, the

-11-

Alternative 3 sought to balance the various ORVs "as equitably as possible," which made it preferable to the other identified alternatives. Thus, as long as the boundary placement was "rationally connected," State Farm, 463 U.S. at 43, to the protection of ORVs, NPS was not required to identify a specific ORV on any specific piece of property. And Simmons does not allege that NPS acted contrary to its stated objective of protecting these values.

Moreover, the record amply demonstrates that multiple ORVs were identified within the boundary line in question. Specifically, Simmons's land contains a large portion of viewshed that is directly downstream from Berry Bridge, which is a common launch point for recreational canoeists on the river. His land also contains a large and particularly impressive stand of ponderosa pine trees and habitats that support bald eagle foraging. Indeed, the final boundary line on Simmons's property tracks quite closely the extent of the viewshed and the ponderosa stand. Simmons does not dispute these facts. Instead, he relies on a statement by Hedren—made during a lengthy deposition[7]—in which he said that he could not identify specific features on Simmons's property. But, read in context, that statement indicates confusion about the location of Simmons's property, not confusion about the existence of ORVs. At various other points in the deposition, Hedren clearly and

---

Act could require such inclusion where necessary to protect outstandingly remarkable resources, e.g. because of the need for buffer zones around resources or because of discontinuities in a resource's locations.

Id.

[7]This deposition was granted, we note, solely "for the limited purpose of obtaining evidence that NPS officials acted in bad faith."

specifically identified which ORVs motivated his boundary determination on this property.

In sum, we see no flaw—either generally or related specifically to Simmons's property—in the public, thorough, and comprehensive process that NPS undertook to establish the boundaries of the NSRA.

## IV.

Simmons also raises claims of bad faith and differential treatment, arguing that NPS drew the boundary line on his property where it did because Hedren and he had personal dislike for each other. Agencies may act arbitrarily and capriciously if they treat similarly-situated parties differently or if they act with bad faith. See Petroleum Commc'ns Inc. v. FCC, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (differential treatment); Latecoere Int'l, Inc. v. U.S. Dept. of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994) (bad faith). On the other hand, there is a well-established presumption that administrative officers are unbiased. See Schweiker v. McClure, 456 U.S. 188, 195 (1982) (citing Withrow v. Larkin, 421 U.S. 35, 47 (1975)). Here, Simmons's argument relies entirely on select quotes from Hedren's deposition that, when read in context, do not prove his case.[8] Thus, as to bad faith, we agree with the district court that "the evidence does not support this claim." And, indeed, the same is true regarding differential treatment. Simmons alleges that the district court did not examine all the evidence because, in its assessment of differential treatment, it looked only at the one

---

[8] For example, Simmons argues that Hedren "favored" Simmons's brother, Carl Simmons, and moved the boundary line on the property after he discovered that Lee Simmons, and not Carl, owned the property. The record does not support this argument. Hedren knew throughout the entire process that the ownership of the Simmonses' familial property was fluid and there is no indication that his understanding shifted around the time that the boundary line was moved. Simmons implies that Hedren preferred Carl because he said that Carl was "sensitive to the resources, to the values of the river." In the very next sentence, however, Hedren said the same thing about Simmons: "Lee was sensitive to the resources and the values."

-13-

landowner Simmons had identified "*as an example* of differing treatment." However, as the district court noted, that landowner was not treated differently and, both below and on appeal, Simmons identifies no facts that indicate NPS "treate[ed] similarly situated parties differently." See Petroleum Commc'ns, 22 F.3d at 1172. The district court looked at the only example that Simmons provided and correctly determined that no such differential treatment was evident. Based on the record and briefing before us, we agree.

## V.

NPS engaged in a methodical, time-consuming boundary-drawing process. It used the appropriate statutory standard to identify oustandingly remarkable values and it drew a boundary line that sought to protect those values. There is no evidence in the record that leads us to conclude that NPS subjected Simmons to disparate treatment or acted in bad faith. For these reasons, we affirm the district court's grant of summary judgment in favor of NPS.

———————————————