# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-1799

_____

Northport Health Services of Arkansas, LLC, doing business as Springdale Health and Rehabilitation Center; NWA Nursing Center, LLC, doing business as The Maples; Ashland Place Health and Rehabilitation, LLC; Aspire Physical Recovery Center at Cahaba River, LLC; Aspire Physical Recovery Center at Hoover, LLC; Aspire Physical Recovery Center of West Alabama, LLC; Athens Health and Rehabilitation, LLC; Civic Center Health and Rehabilitation, LLC; Columbiana Health and Rehabilitation, LLC; Cordova Health and Rehabilitation, LLC; Crossville Health and Rehabilitation, LLC; Florala Health and Rehabilitation, LLC; Georgiana Health and Rehabilitation, LLC; Gulf Coast Health and Rehabilitation, LLC; Hunter Creek Health and Rehabilitation, LLC; Huntsville Health and Rehabilitation, LLC; Jacksonville Health and Rehabilitation, LLC; Legacy Health and Rehabilitation of Pleasant Grove, LLC; Lineville Health and Rehabilitation, LLC; Luverne Health and Rehabilitation, LLC; Moundville Health and Rehabilitation, LLC; Northport Health Services of Arkansas, LLC, doing business as Covington Court Health and Rehabilitation Center, doing business as Fayetteville Health and Rehabilitation Center, doing business as Springdale Health and Rehabilitation Center, doing business as Legacy Health and Rehabilitation Center, doing business as Paris Health and Rehabilitation Center; Northport Health Services of Florida, LLC, doing business as Crystal River Health and Rehabilitation Center, doing business as Ocala River Health and Rehabilitation Center, doing business as Daytona Beach Health and Rehabilitation Center, doing business as St. Augustine Health and Rehabilitation Center, doing business as West Melbourne Health and Rehabilitation Center; Northport Health Services of Missouri, LLC, doing business as Joplin Health and Rehabilitation Center, doing business as Webb City Health and Rehabilitation Center, doing business as Carthage Health and Rehabilitation Center, doing business as Warsaw Health and Rehabilitation Center, doing business as Pleasant Hill Health and Rehabilitation Center; Northway Health & Rehabilitation, LLC; Oak Knoll Health and Rehabilitation, LLC; Opp Health and Rehabilitation, LLC; Ozark Health and Rehabilitation, LLC; Palm Gardens Health and Rehabilitation, LLC; Park Manor Health and Rehabilitation, LLC; Prattville Health and Rehabilitation, LLC; South

Haven Health and Rehabilitation, LLC; South Health and Rehabilitation, LLC; Sumter Health and Rehabilitation, LLC; Tallassee Health and Rehabilitation, LLC; Valley View Health and Rehabilitation, LLC; Wetumpka Health and Rehabilitation, LLC; AFNC, Inc., doing business as Eaglecrest Nursing and Rehab; Beebe Retirement Center, Inc.; BNNC, Inc., doing business as Alcoa Pines Health and Rehabilitation; BVNC, Inc., doing business as Alcoa Pines Health and Rehabilitation; CNNC, Inc., doing business as Corning Therapy and Living Center; FPNC, Inc., doing business as Twin Lakes Therapy and Living; GVNC, Inc., doing business as Gassville Therapy and Living; HBNC, Inc., doing business as Southridge Village Nursing and Rehab; HLNC, Inc., doing business as Heritage Living Center; HSNC, Inc., doing business as Village Springs Health and Rehabilitation; JBNC, Inc., doing business as Ridgecrest Health and Rehabilitation; Jonesboro Care and Rehabilitation Center, LLC, doing business as St. Elizabeths Place; JRNRC OPS, Inc., doing business as James River Nursing and Rehabilitation; Linco Health, Inc., doing business as Gardner Nursing and Rehabilitation; MHCNC, Inc., doing business as Care Manor Nursing and Rehab; MLBNC, Inc., doing business as Pioneer Therapy and Living; MMNC, Inc., doing business as The Lakes at Maumelle Health and Rehabilitation; MSNRC OPS, Inc., doing business as Magnolia Square Nursing and Rehab; Nashville Nursing & Rehab, Inc.; Northwest Health and Rehab, Inc., doing business as North Hills Life Care and Rehab; OCNC, Inc., doing business as Silver Oaks Health and Rehabilitation; OR OPS, Inc., doing business as Oak Ridge Health and Rehabilitation; PM OPS, Inc., doing business as Dierks Health and Rehab; RTNC, Inc., doing business as Rector Nursing and Rehab; Salco NC, Inc., doing business as Evergreen Living Center at Stagecoach; Salco NC 2, Inc., doing business as Amberwood Health and Rehabilitation; SCNC, Inc., doing business as Spring Creek Health & Rehab; Senior Living Management Group, LLC, doing business as Birch Pointe Health and Rehabilitation; SLNC, Inc., doing business as Southfork River Therapy and Living; SRCNC, Inc., doing business as The Crossing at Riverside Health and Rehabilitation; Timberlane Care and Rehabilitation Center, LLC, doing business as Timberlane Health & Rehabilitation; TXKNC, Inc., doing business as Bailey Creek Health & Rehab; WCNC, Inc., doing business as Katherines Place at Wedington; Westwood Health and Rehab, Inc.; Windcrest Health and Rehab, Inc.; WRNC, Inc., doing business as Chapel Woods Health and Rehabilitation; Apple Creek Health and Rehab, LLC; Ashton Place Health and Rehab, LLC; Atkins Care Center, Inc.; Belvedere Nursing and Rehabilitation Center, LLC; Bradford House Nursing and Rehab,

LLC; Briarwood Nursing and Rehabilitation Center, Inc.; Cabot Health and Rehab, LLC; Chapel Ridge Nursing Center, LLC; Colonel Glenn Health and Rehab, LLC; Dardanelle Nursing and Rehabilitation Center, Inc.; Nursing and Rehabilitation Center at Good Shepherd, LLC; Greenbrier Care Center, Inc.; Greystone Nursing and Rehab, LLC; Heather Manor Care Center, Inc.; Hickory Heights Health and Rehab, LLC; Innisfree Health and Rehab, LLC; Jamestown Nursing and Rehab, LLC; Johnson County Health and Rehab, LLC; Country Club Gardens, LLC; Lakewood Health and Rehab, LLC; Legacy Heights Nursing and Rehab, LLC; Lonoke Health and Rehab Center, LLC; Oak Manor Nursing and Rehabilitation Center, Inc.; Perry County Care Center, Inc.; Quapaw Care and Rehabilitation Center, LLC; Robinson Nursing & Rehabilitation Center, LLC; Russellville Car Center, Inc.; Salem Place Nursing and Rehabilitation Center, Inc.; Sherwood Nursing and Rehabilitation Center, Inc.; Shiloh Nursing and Rehab, LLC; Stella Manor Care Center, Inc.; Superior Health & Rehab, LLC; Eufaula Care Center, Inc.; Cherokee County Nursing Center, Inc.; Parks Edge Care Center, Inc.; Hendrix Health Care Center, Inc., doing business as Hendrix Health & Rehabilitation; Glen Haven Health and Rehabilitation, LLC

*Plaintiffs - Appellants*

v.

U.S. Department of Health and Human Services; Xavier Becerra,[1] in his official capacity as Secretary of the U.S. Department of Health & Human Services; Centers for Medicare & Medicaid Services; Chiquita Brooks-LaSure,[2] in her official capacity as the Administrator of the Centers for Medicare & Medicaid Services

*Defendants - Appellees*

------------------------------

---

[1]Xavier Becerra is automatically substituted pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[2]Chiquita Brooks-LaSure is automatically substituted pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Public Citizen

*Amicus on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville
_____

Submitted: January 15, 2021
Filed: October 1, 2021
_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.
_____

KELLY, Circuit Judge.

Northport Health Services of Arkansas, LLC, and other similarly situated long-term care (LTC) facilities (collectively, Northport) appeal the decision of the district court[3] granting summary judgment in favor of the U.S. Department of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS, and collectively, the government). Northport argues that a regulation promulgated by CMS through notice and comment rulemaking is unlawful and should be set aside for violating the Administrative Procedure Act (APA), 5 U.S.C. § 706, the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, and the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 *et seq.* Having jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[3]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

# I. Background

*A. Factual and Regulatory Background*

The federal government subsidizes eligible individuals' health care through two large programs: Medicare and Medicaid. Medicare, the second largest federal program, spends approximately $800 billion annually "to provide health insurance to nearly 60 million aged or disabled Americans." Azar v. Allina Health Servs., 139 S. Ct. 1804, 1808 (2019); see NHE Fact Sheet, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet (last modified Dec. 16, 2020). "Medicaid is a cooperative federal-state program through which the Federal Government provides [approximately $600 billion in] financial assistance to States so that they may furnish medical care to needy individuals." Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990); see NHE Fact Sheet, supra. The Secretary of HHS administers both programs through CMS, a sub-agency of HHS. To provide services to Medicare- and Medicaid-covered individuals, medical providers must enter into provider agreements that establish treatment standards and set reimbursement rates for available services. See 42 U.S.C. §§ 1395cc, 1396a.

Medicare and Medicaid provide coverage for long-term residents of nursing homes, commonly referred to as LTC facilities. Participating LTC facilities must comply with the requirements set forth in 42 U.S.C. § 1395i-3 (Medicare) and 42 U.S.C. § 1396r (Medicaid), as well as the regulations promulgated thereunder, see 42 C.F.R. §§ 483.1–.95. The plaintiffs in this matter are "dually-certified" LTC facilities, meaning they provide long-term care under both the Medicare and Medicaid programs.

In 2015, CMS initiated notice and comment rulemaking to comprehensively revise the requirements for LTC facilities to participate in the Medicare and Medicaid

programs. See Reform of Requirements for Long-Term Care Facilities, 80 Fed. Reg. 42,168, 42,168–69 (proposed July 16, 2015). The regulatory reforms were intended to "improve the quality of life, care, and services in LTC facilities, optimize resident safety, reflect current professional standards, and improve the flow of the regulations" in light of "evidence-based research . . . [that] enhanced [CMS's] knowledge about resident safety, health outcomes, individual choice, and quality assurance and performance improvement." Id. at 42,169. In that vein, CMS noted the potential benefits of alternative dispute resolution, including arbitration, but also expressed its concern that LTC facilities' "superior bargaining power could result in a resident feeling coerced into signing the agreement," that residents might be waiving the right to judicial relief without full understanding, and that the prevalence of pre-dispute arbitration agreements "could be detrimental to residents' health and safety." Id. at 42,211. CMS therefore proposed certain limitations on LTC facilities' use of arbitration agreements, including requirements that the facilities explain such agreements to residents in a form, manner, and language that they understand and that they not treat arbitration agreements as a "condition of admission, readmission, or the continuation of [one's] residence at the facility." Id. In addition, reflecting a more general concern regarding the use of such agreements by LTC facilities, CMS stated it was considering and soliciting comments on "whether binding arbitration agreements should be prohibited" in the case of nursing home residents. Id.

On October 4, 2016, after an extended comment period, CMS published the final version of the rule (Original Rule) in the Federal Register. See Reform of Requirements for Long-Term Care Facilities, 81 Fed. Reg. 68,688 (Oct. 4, 2016). In a shift from the proposed rule, the final rule prohibited LTC facilities from entering into pre-dispute, binding arbitration agreements with residents or their representatives. See id. at 68,690. CMS clarified further that, "[a]fter a dispute arises, the resident and the LTC facility may voluntarily enter into a binding arbitration agreement if both parties agree and comply with the relevant requirements" of the final rule. Id. at 68,800.

-6-

Several weeks later, before the Original Rule was to take effect on November 28, 2016, see id. at 68,688, a group of Mississippi nursing homes sued to preliminarily and permanently enjoin enforcement of the rule's arbitration provision. See Am. Health Care Ass'n v. Burwell, 217 F. Supp. 3d 921, 926 (N.D. Miss. 2016). Similar to this case, the nursing homes claimed that the rule's blanket prohibition of LTC facilities' use of pre-dispute arbitration agreements violated the APA, the FAA, and the RFA. See id. at 929–42. Finding that the nursing homes were likely to prevail, the district court granted a nationwide preliminary injunction of the challenged provision of the Original Rule. See id. at 946.

Rather than appeal the district court's decision, CMS initiated another round of notice and comment rulemaking several months later to revise the enjoined portion of the Original Rule. CMS proposed removing the requirement that precluded LTC facilities from entering into pre-dispute, binding arbitration agreements, reasoning that, "[u]pon reconsideration, [it] believe[d] that arbitration agreements are, in fact, advantageous to both providers and beneficiaries because they allow for the expeditious resolution of claims without the costs and expense of litigation." Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 82 Fed. Reg. 26,649, 26,650–51 (proposed June 8, 2017). CMS nevertheless acknowledged some concerns about the use of arbitration agreements in LTC facilities and proposed strengthening some requirements "to ensure the transparency of arbitration agreements in LTC facilities" and to strike the "best policy balance." Id. at 26,651.

After the comments period concluded, CMS published the final version of the rule (Revised Rule) in the Federal Register, to go into effect on September 16, 2019. See Revision of Requirements for Long-Term Care Facilities: Arbitration Agree-

ments, 84 Fed. Reg. 34,718, 34,718 (July 18, 2019) (codified at 42 C.F.R. § 483.70(n)).  It provided:

> (n) *Binding arbitration agreements.* If a facility chooses to ask a resident or his or her representative to enter into an agreement for binding arbitration, the facility must comply with all of the requirements in this section.
>
>> (1) The facility must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility and must explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility.
>>
>> (2) The facility must ensure that:
>>
>>> (i) The agreement is explained to the resident and his or her representative in a form and manner that he or she understands, including in a language the resident and his or her representative understands;
>>>
>>> (ii) The resident or his or her representative acknowledges that he or she understands the agreement;
>>>
>>> (iii) The agreement provides for the selection of a neutral arbitrator agreed upon by both parties; and
>>>
>>> (iv) The agreement provides for the selection of a venue that is convenient to both parties.
>>
>> (3) The agreement must explicitly grant the resident or his or her representative the right to rescind the agreement within 30 calendar days of signing it.

(4) The agreement must explicitly state that neither the resident nor his or her representative is required to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility.

(5) The agreement may not contain any language that prohibits or discourages the resident or anyone else from communicating with federal, state, or local officials, including but not limited to, federal and state surveyors, other federal or state health department employees, and representatives of the Office of the State Long-Term Care Ombudsman, in accordance with § 483.10(k).

(6) When the facility and a resident resolve a dispute through arbitration, a copy of the signed agreement for binding arbitration and the arbitrator's final decision must be retained by the facility for 5 years after the resolution of that dispute on and be available for inspection upon request by CMS or its designee.

Id. at 34,735–36 (quoting proposed 42 C.F.R. § 483.70(n)).

*B. Procedural History*

On September 4, 2019, Northport filed this lawsuit challenging multiple aspects of the Revised Rule: (i) the requirement that a binding arbitration agreement not be made a condition for the admission to, or the continuation of care in, an LTC facility, 42 C.F.R. § 843.70(n)(1); (ii) the requirement that residents be granted a right to rescind a binding arbitration agreement within 30 days of signing, id. § 843.70(n)(3); (iii) the requirement that any arbitration agreement (a) be explained to the resident so he or she understands it and (b) explicitly state that signing it is not a condition of admission to the LTC facility, id. § 843.70(n)(2)(i)–(ii), (4); and (iv) the requirement that the LTC facility retain copies of the signed arbitration agreement and any final arbitration decisions for five years, id. § 843.70(n)(6). Northport moved to preliminarily enjoin the enforcement of the Revised Rule or, in the alternative, to

stay enforcement pending judicial review. While that motion was pending, the parties agreed to stay enforcement of the Revised Rule until the district court ruled on the merits of the case, and they cross-moved for summary judgment based on the administrative record.

On April 7, 2020, the district court denied Northport's motion for summary judgment and granted the government's motion for summary judgment, upholding the Revised Rule. The court reasoned that the rule (i) did not violate the FAA, 9 U.S.C. § 2; (ii) was a permissible exercise of HHS's statutory authority under the Medicare and Medicaid statutes; (iii) was not "arbitrary and capricious" under the APA, 5 U.S.C. § 706(2)(A); and (iv) was promulgated in compliance with the RFA, 5 U.S.C. § 605(b). Northport now appeals, and we have granted a stay of the Revised Rule's enforcement pending resolution of this appeal.

## II. Discussion

Northport revives its four challenges to the Revised Rule on appeal. "We review de novo a district court's decision on whether an agency action violates the APA." Simmons v. Smith, 888 F.3d 994, 998 (8th Cir. 2018) (quoting Friends of the Norbeck v. U.S. Forest Serv., 661 F.3d 969, 975 (8th Cir. 2011)); see also 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."). We may set aside agency action under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)–(D).

*A. Conflict with the Federal Arbitration Act*

Northport first argues that the Revised Rule violates the FAA and is therefore "not in accordance with law," id. § 706(2)(A), because it subjects arbitration agreements to "disfavored treatment." Enacted in 1925 "in response to widespread judicial hostility to arbitration agreements," AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011), the FAA provides that the terms of a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As described by the Supreme Court, this provision "establishes an equal-treatment principle," requiring "courts to place arbitration agreements 'on equal footing with all other contracts.'" Kindred Nursing Ctrs. Ltd. P'ship v. Clark, 137 S. Ct. 1421, 1424, 1426 (2017) (quoting DIRECTV, Inc. v. Imburgia, 577 U.S. 47, 48 (2015)).

Northport argues that the Revised Rule contravenes the equal-treatment principle because it "singles out" arbitration agreements, including by regulating LTC facilities' ability to enter into them with residents. For example, Northport reasons that prohibiting LTC facilities from requiring residents to sign arbitration agreements as a condition for admission, 53 C.F.R. § 483.70(n)(1), "restricts the use of arbitration agreements" and violates the FAA. We disagree. Such a construction of the FAA ignores the statute's plain language and interpreting precedent and would significantly expand the scope of the FAA to manufacture a conflict with the Revised Rule where none exists. Simply put, the Revised Rule does not come up against the FAA because it does not limit or frustrate the enforceability of valid arbitration agreements.

As noted above, the "savings clause" of the FAA "permits arbitration agreements to be declared *unenforceable* 'upon such grounds as exist at law or in equity for the revocation of any contract.'" Concepcion, 563 U.S. at 339 (emphasis added) (quoting 9 U.S.C. § 2). That is, an agreement to arbitrate a dispute may "be *invalidated* by 'generally applicable contract defenses, such as fraud, duress, or

unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." Id. (emphasis added) (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). Thus, in AT&T Mobility LLC v. Concepcion, the Supreme Court held that a California rule that treated class-action waivers in arbitration agreements as per se unconscionable was preempted by the FAA. See id. at 340, 352. Although unconscionability typically is a "generally applicable contract defense," the Court reasoned that California was applying the doctrine discriminately to arbitration agreements by finding class-action waivers particularly unconscionable when included therein. See id. at 341–44, 346–48. And under the FAA, California courts could not avoid *enforcing* arbitration agreements, including their class-action waivers, "according to their terms." Id. at 344 (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)).

In our reading, the Supreme Court has never applied the FAA to prohibit a federal agency from generally regulating the use of arbitration agreements as CMS does here. Rather, it has construed the FAA simply to limit the circumstances in which arbitration agreements, once entered into, can be rendered invalid or unenforceable. So, for example, in Kindred Nursing Centers Ltd. Partnership v. Clark, the Court held that the FAA preempted a Kentucky rule that would have rendered invalid (and thereby unenforceable) arbitration agreements entered into by a principal's legal representative if the governing power of attorney did not specifically state that the representative was entitled to enter into arbitration agreements on the principal's behalf. See 137 S. Ct. at 1425–27; see also id. at 1428 ("A rule selectively finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made."). Likewise, in Preston v. Ferrer, the Court held that the FAA preempted a California rule that required exhaustion of state administrative remedies before arbitration, despite the fact that the parties had "agree[d] to arbitrate all questions arising under [the] contract." 552 U.S. 346, 359 (2008). Because

-12-

requiring parties to initially refer their disputes to a state administrative body would frustrate the benefits of utilizing arbitration in the first instance, see id. at 357–58 ("A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results." (cleaned up)), the rule effectively rendered valid arbitration agreements unenforceable and violated the FAA. See id. at 359. And in Epic Systems Corp. v. Lewis, the Supreme Court considered whether the National Labor Relations Act (NLRA) rendered certain agreements requiring individualized (as opposed to classwide) arbitration *unenforceable.* See 138 S. Ct. 1612, 1620 (2018); see also id. at 1622 (discussing the contract *defenses* that are preempted by the FAA: "defenses that target arbitration by name or by more subtle methods, such as by interfering with fundamental attributes of arbitration" (cleaned up)). Assuming the NLRA rendered class and collective action waivers in arbitration agreements illegal, the Court concluded that such a rule would violate the FAA because it would operate as a defense applicable to arbitration agreements only. See id. at 1622–23.

The Revised Rule, in comparison to the rules challenged in the above cases, does not invalidate or render unenforceable any arbitration agreement. See 84 Fed. Reg. at 34,718 ("This final rule does not purport to regulate the enforcement of any arbitration agreement . . . ."); id. at 34,729 ("CMS does not have the power to annul valid contracts."); see also id. at 34,732 ("This rule in no way would prohibit two willing and informed parties from entering voluntarily into an arbitration agreement."). Instead, it establishes the conditions for receipt of federal funding through the Medicare and Medicaid programs. See id. at 34,733 (noting that LTC facilities may enter into arbitration agreements "so long as they comply with the requirements" finalized in the Revised Rule). So, for example, if an LTC facility entered into an arbitration agreement with a resident without complying with the Revised Rule by requiring the resident to sign as a condition of admission to the facility, see 42 C.F.R. § 483.70(n)(1), the arbitration agreement would nonetheless be enforceable, absent a showing of "generally applicable contract defenses, such as fraud, duress, or unconscionability," Concepcion, 563 U.S. at 339; see 9 U.S.C. § 2. CMS would

-13-

simply enforce the regulation through a combination of administrative remedies, including denial of payment and civil monetary penalties.  See 42 C.F.R. § 488.406; 84 Fed. Reg. at 34,733.

In summary, Northport expansively argues that the FAA established "a liberal federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), that is frustrated by the Revised Rule's regulation of nursing homes' use of arbitration agreements.[4]  However, "courts do not apply federal policies; they apply federal statutes, and the FAA speaks only to the validity, irrevocability and enforceability of arbitration agreements."  Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos, 436 F. Supp. 3d 333, 344 (D.D.C. 2020), vacated as moot, No. 20-5080, 2020 WL 9171125 (D.C. Cir. Oct. 14, 2020).  Because the Revised Rule does not, in words or effect, render arbitration agreements entered into in violation thereof invalid or unenforceable, it does not conflict with the FAA.[5]

---

[4]Northport largely ignores the extent to which the Revised Rule *favors* arbitration as "an appropriate forum to resolve disputes."  84 Fed. Reg. at 34,729; see also id. at 34,732 ("We acknowledge the[] advantages and disadvantages to arbitration and believe that the requirements in this final rule provide the transparency and opportunity for the resident and his or her representative to evaluate those advantages and disadvantages and make a choice that is best for them.  This rule in no way would prohibit two willing and informed parties from entering voluntarily into an arbitration agreement.").

[5]Because we find no conflict between the FAA and the Revised Rule, we need not address Northport's argument that Congress has not evinced a "clear and manifest" intention to empower CMS to promulgate rules overriding the FAA.  See Epic Sys., 138 S. Ct. at 1624 ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." (cleaned up)).  Such an intention is unnecessary where there is "no conflict at all."  Id. at 1625.  Nor do we address Northport's argument that the Revised Rule engages in "economic dragooning," leaving LTC facilities "no real option but to acquiesce" to its regulations of arbitration agreements.  Nat'l Fed. of Indep. Bus. v. Sebelius, 567 U.S.

-14-

*B. HHS's Statutory Authority Under the Medicare and Medicaid Statutes*

Next, Northport argues that the Revised Rule should be set aside because it exceeds HHS's statutory authority under the Medicare and Medicaid statutes to promulgate regulations (i.e., that it is ultra vires). See 5 U.S.C. § 706(2)(C); see also U.S. ex rel. O'Keefe v. McDonnell Douglas Corp., 132 F.3d 1252, 1257 (8th Cir. 1998) ("An agency's promulgation of rules without valid statutory authority implicates core notions of the separation of powers, and we are required by Congress to set these regulations aside."). We review such a claim using the familiar Chevron framework. See Iowa League of Cities v. E.P.A., 711 F.3d 844, 876 (8th Cir. 2013). "Under that framework, we ask whether the statute is ambiguous and, if so, whether the agency's interpretation is reasonable." King v. Burwell, 576 U.S. 473, 485 (2015) (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984)). The two-step Chevron framework "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." Id. (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000)).

---

519, 582 (2012) (plurality opinion). For one, a plurality of the Supreme Court used that language to describe the federal government's limited constitutional authority under the Spending Clause to regulate the states, see id. at 575–85, not a federal agency's ability to regulate LTC facilities' use of federal funding, as in this case. Indeed, it is irrelevant for the purposes of the FAA whether LTC facilities—private businesses that voluntarily participate in the Medicare and Medicaid programs, see Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Health, 742 F.2d 442, 446 (8th Cir. 1984); Livingston Care Ctr., Inc. v. United States, 934 F.2d 719, 720–21 (6th Cir. 1991)—must comply with the Revised Rule as the price of admission to obtain federal funding. The Revised Rule's regulations do not affect the validity or enforceability of LTC facilities' arbitration agreements, and they therefore do not conflict with the FAA.

The government relied on three sections of the Medicare and Medicaid statutes as the bases for its statutory authority to promulgate the Revised Rule. See 84 Fed. Reg. at 34,718, 34,725.

> It is the duty and responsibility of the Secretary to assure that requirements which govern the provision of care in [participating LTC facilities], and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys.
>
> 42 U.S.C. §§ 1395i-3(f)(1), 1396r(f)(1).
>
> A [participating LTC facility] must meet such other requirements relating to the health, safety, and well-being of residents or relating to the physical facilities thereof as the Secretary may find necessary.
>
> Id. § 1395i-3(d)(4)(B); cf. id. § 1396r(d)(4)(B).
>
> A [participating LTC facility] must protect and promote the rights of each resident, including . . . [a]ny other right established by the Secretary.
>
> Id. §§ 1395i-3(c)(1)(A)(xi), 1396r(c)(1)(A)(xi).[6]

---

[6]Northport argues that the government "disclaimed reliance" on this last pair of provisions because it was not cited in the section titled "Statutory Authority" of the Revised Rule. See 84 Fed. Reg. at 34,718; see also Michigan v. E.P.A., 576 U.S. 743, 758 (2015) (noting "the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action"). However, the Revised Rule did cite these provisions as statutory authorities for promulgating the Original Rule, which was "designed to accomplish the same goals" as the Revised Rule, 84 Fed. Reg. at 34,725; see also 82 Fed. Reg. at 26,651 (claiming statutory authority to issue the Revised Rule under these three provisions), and we consider all three statutory bases proffered by the government, see Union Pac. R.R. Co. v. Surface Transp. Bd., 863 F.3d 816, 824 (8th Cir. 2017).

-16-

To determine whether a statute is ambiguous, we start with its plain language. See Ark. AFL-CIO v. F.C.C., 11 F.3d 1430, 1440 (8th Cir. 1993) (en banc). "If congressional intent is clearly discernable, the agency must act in accordance with that intent and the court need not defer to the agency's interpretation of its mandate." Id. Thus, we must determine whether Congress intended HHS to have the authority to regulate LTC facilities' use of arbitration agreements. See Friends of the Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 823 (8th Cir. 2006).

Looking to the above statutory provisions, we conclude that the Medicare and Medicaid statutes are ambiguous as to whether HHS has the authority to regulate the use of arbitration agreements. The statutes are broadly worded to give HHS significant leeway in deciding how best to safeguard LTC residents' health and safety and protect their dignity and rights. For example, the statutes delegate authority to the Secretary to promulgate regulations ensuring the "provision of care" at LTC facilities is adequate to "protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys." 42 U.S.C. §§ 1395i-3(f)(1), 1396r(f)(1). More capaciously, the statutes confer authority to the Secretary to promulgate regulations "relating to the health, safety, and well-being of residents" as deemed "necessary." Id. § 1395i-3(d)(4)(B); cf. id. § 1396r(d)(4)(B). And most expansively, the Secretary is empowered to "protect and promote" the rights of residents he or she may deem important. Id. §§ 1395i-3(c)(1)(A)(xi), 1396r(c)(1)(A)(xi).

We disagree with Northport's arguments that the statutes are sufficiently unambiguous to conclude that Congress did not intend for HHS to have the authority to regulate the use of arbitration agreements. First, Northport contends that arbitration is not "meaningful[ly] connect[ed]" to residents' "healthy, safety, and well-being," e.g., id. § 1395i-3(d)(4)(B), and falls outside HHS's wheelhouse—the "provision of care," id. §§ 1395i-3(f)(1), 1396r(f)(1). In effect, Northport implies that although HHS is empowered to regulate the terms of residents' medical, palliative,

or residential care, HHS does not have the authority to regulate the administrative side of LTC facilities. Looking to the "text and context" of the statute, Union Pac. R.R. Co., 863 F.3d at 825, we reject such a narrow reading of HHS's authority. In addition to conferring the general responsibility to promulgate regulations governing the "provision of care . . . adequate to protect the health, safety, welfare, and rights of residents," 42 U.S.C. §§ 1395i-3(f)(1), 1396r(f)(1), Congress gave HHS the power to develop standards for the qualification of LTC facility administrators, id. §§ 1395i-3(f)(4), 1396r(f)(4), to establish criteria for the administration of LTC facilities, id. §§ 1395i-3(f)(5), 1396r(f)(5), and to specify data to be collected by LTC facilities, id. §§ 1395i-3(f)(6), 1396r(f)(6). These provisions, though not themselves the statutory bases of the Revised Rule, demonstrate that HHS is not restricted to regulating only matters concerning residents' standard of medical care.

Next, relying on the interpretive canon that expressing some items of a group excludes the omitted items, see N.L.R.B. v. SW General, Inc., 137 S. Ct. 929, 940 (2017) (defining *expressio unius est exclusio alterius*), Northport argues that Congress did not intend HHS to regulate LTC facilities' ability to condition residents' admission on signing arbitration agreements. In Northport's view, by enacting express provisions governing LTC facilities' admissions practices without mentioning arbitration agreements, see 42 U.S.C. §§ 1395i-3(c)(5), 1396r(c)(5), Congress intentionally withheld authority from HHS to promulgate regulations on that issue. "But that canon [is] a feeble helper in an administrative setting," Child.'s Hosp. Ass'n of Tex. v. Azar, 933 F.3d 764, 770–71 (D.C. Cir. 2019) (cleaned up), particularly when, as here, Northport points to no evidence suggesting that "Congress considered the unnamed possibility and meant to say no to it," Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003). Moreover, Northport's argument would suggest that HHS lacks the authority to regulate admissions practices beyond that specified in the pertinent statutory provisions, a claim undermined by other HHS regulations that do just that. See, e.g., 42 C.F.R. § 483.15(a)(2)(iii), (6).

Finally, Northport infers from the fact that HHS had not tried to promulgate regulations governing the use of arbitration agreements until 2016, when it published the Original Rule, that HHS had implicitly recognized it lacked the statutory authority to do so. Northport points to no authority suggesting that an agency's inaction defines the boundaries of that agency's statutory authority. Indeed, we do not draw comparable inferences from *legislative* inaction. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." (cleaned up)). But more directly, whether or not an agency has previously attempted to exercise statutory authority it may or may not have does not answer the question before us—whether the statute is ambiguous, thereby implicitly leaving a gap in the statute to be filled. See Iowa League of Cities, 711 F.3d at 877.

Having determined that the Medicare and Medicaid statutes are ambiguous, we look to whether the agency's interpretation "is based on a permissible construction of the statute[s]." Andrade-Zamora v. Lynch, 814 F.3d 945, 951 (8th Cir. 2016) (quoting City of Arlington v. F.C.C., 569 U.S. 290, 296 (2013)); see Ark. AFL-CIO, 11 F.3d at 1441 (noting "the agency's construction of [a] statute must be reasonable"). An agency's reasonable interpretation of a statute is entitled to "substantial deference." Bosworth, 437 F.3d at 821. In conducting our analysis, we need not identify the interpretation we would have taken had the question been presented to us initially in a judicial proceeding, as "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Simmons, 888 F.3d at 998 (quoting Chevron, 467 U.S. at 844); see also Unity Healthcare v. Azar, 918 F.3d 571, 578 (8th Cir. 2019) ("[T]he question before us is not whether an agency interpretation represents the best interpretation of the statute, but whether it represents a reasonable one." (quoting Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 744–45 (1996))). Rather, we will uphold the agency's interpretation "so long as we can reasonably conclude that the grants of authority in

the statutory provisions cited by the government contemplate the issuance." <u>Iowa League of Cities</u>, 711 F.3d at 877 (cleaned up).

Reviewing the provisions of the Revised Rule, we conclude that they are reasonable interpretations of the Medicare and Medicaid statutes. As noted by CMS, the Revised Rule reflects the agency's belief that "arbitration has both advantages and disadvantages" and permits LTC facilities "to ask their residents to sign arbitration agreements so long as they comply with the [Revised Rule's] requirements." 84 Fed. Reg. at 34,732–33. Generally, these requirements ensure that residents who enter into arbitration agreements with LTC facilities do so knowingly and voluntarily, without the specter that the facility will deny care should they refuse. For example, LTC facilities may not require a resident to sign an arbitration agreement either as a condition of admission or as a requirement to continue receiving care. <u>See</u> 42 C.F.R. § 483.70(n)(1); <u>see also</u> <u>id.</u> § 483.70(n)(4). LTC facilities must explain the function of the arbitration agreement before a resident signs it, and they must afford residents the right to rescind the agreement within 30 days of signing it. <u>See</u> <u>id.</u> § 483.70(n)(2)(i), (3). And to assist CMS in monitoring the efficacy of arbitration in resolving disputes between residents and LTC facilities, the Revised Rule requires LTC facilities to keep for five years the applicable arbitration agreement and the arbitrator's final decision if ever a dispute is resolved. <u>See</u> <u>id.</u> § 483.70(n)(6).

In our view, it is reasonable for CMS to conclude that regulating the use of arbitration agreements in LTC facilities furthers the health, safety, and well-being of residents, particularly during the critical stage when a resident is first admitted to a facility. <u>See</u> 42 U.S.C. § 1395i-3(d)(4)(B), (f)(1); <u>id.</u> § 1396r(d)(4)(B), (f)(1). We can appreciate how conditioning care on entering into a binding arbitration agreement may frustrate residents' access to treatment or jeopardize their health and well-being. <u>See</u> 84 Fed. Reg. at 34,726 (noting that the Revised Rule "holds the [LTC] facility accountable by ensuring that [it] cannot coerce or apply unreasonable pressure on a resident . . . by implying the resident would not receive the care he or she needs

without signing the agreement"); see also id. at 32,727 (noting that "residents are frequently admitted during a time of stress and often after a decline in their health or directly from the hospital . . . mak[ing] it extremely difficult for LTC residents . . . to make an informed decision about arbitration"). Likewise, we think the Revised Rule is a reasonable exercise of CMS's authority to protect residents' rights. See 42 U.S.C. §§ 1395i-3(c)(1)(A)(xi), 1396r(c)(1)(A)(xi).

In summary, the Revised Rule "represents a reasonable accommodation of manifestly competing interests and is entitled to deference." Chevron, 467 U.S. at 865. We affirm the district court's conclusion that it is not ultra vires.

### C. Northport's Challenge to the Rule as Arbitrary and Capricious

Next, Northport argues that the Revised Rule should be set aside because it is "arbitrary, capricious, [and] an abuse of discretion." See 5 U.S.C. § 706(2)(A). When promulgating a rule, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.; see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 536 (2009) (Kennedy, J., concurring in the judgment) ("The question in each case is whether the agency's reasons for the change, when viewed in light of the data available to it, and when informed by the experience and expertise of the agency, suffice to demonstrate that the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its

authority."). Our scope of review is narrow, and we are "not to substitute [our] judgment for that of the agency." State Farm, 463 U.S. at 43. Although "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given," id. (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)), we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," id. (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

Northport raises two arguments as to why the Revised Rule is arbitrary and capricious. First, it suggests that the rule was "based on sheer speculation" because CMS relied principally on anecdotal evidence rather than quantitative social science evidence to support the rule. See, e.g., 84 Fed. Reg. at 34,722, 34,726 (noting that CMS believed the Revised Rule was "the best way to strike a balance" between "a great deal of anecdotal evidence and reportage" critical of LTC facilities' use of arbitration agreements and the "lack of statistical data" showing "that arbitration agreements necessarily have a negative effect on quality of care"). But "[t]he APA imposes no general obligation on agencies to produce empirical evidence," Stilwell v. Office of Thrift Supervision, 569 F.3d 514, 519 (D.C. Cir. 2009), and CMS was entitled to justify the rule using the available anecdotal evidence so long as it provided a rational, reasoned explanation for doing so. See id.; see also Sacora v. Thomas, 628 F.3d 1059, 1069 (9th Cir. 2010) (noting that although "[i]t may have been preferable for the [agency] to support its conclusions with empirical research," "it was reasonable for the [agency] to rely on its experience, even without having quantified it in the form of a study").

Having reviewed the regulatory record of both the Original Rule and the Revised Rule, we are satisfied that the evidence CMS relied upon is sufficient to support the Revised Rule. See 84 Fed. Reg. at 34,722 (noting that CMS relied on the evidence and comments gathered during the Original Rule's rulemaking process to justify the Revised Rule). For example, CMS took into consideration commenters'

stated beliefs that arbitration agreements in some instances permitted LTC facilities "to avoid responsibility for providing poor or substandard care to their residents," jeopardizing residents' health and safety. 81 Fed. Reg. at 68,793; see also id. (noting that some commenters "had personally witnessed resident neglect and attributed it to facilities believing that they were immune to any legal consequences for their mistreatment because of the likelihood that they would prevail in binding arbitration"). Furthermore, CMS conducted a review of academic literature and court opinions, which "provided evidence that pre-dispute arbitration agreements were detrimental to the health and safety of LTC facility residents." Id. (noting various evidence-based critiques of LTC facilities' use of arbitration agreements, including "the unequal bargaining power between the resident and the LTC facilities; inadequate explanations of the arbitration agreement; the inappropriateness of presenting the agreement upon admission, an extremely stressful time for the residents and their families; negative incentives on staffing and care as a result of not having the threat of a substantial jury verdict for sub-standard care; and the unfairness of the arbitration process for the resident"). Although these observations were not supported by statistical data that quantified their aggregate effect, they were sufficient to justify CMS "implement[ing] a regulation that accommodates arbitration while also protecting LTC facility residents from unfairly coerced agreements." 84 Fed. Reg. at 34,726. Likewise, it was not arbitrary or capricious for CMS to have adopted a rule recognizing the importance of amassing data going forward to continue monitoring the propriety of the rule, see id. at 34,723 ("[T]he requirement to retain copies of the arbitration agreement and the arbitrator's final decision will allow us to learn how arbitration is being used by LTC facilities and how this is affecting the residents."), as agencies are empowered to "adopt prophylactic rules to prevent potential problems before they arise," see Stilwell, 569 F.3d at 519.

Second, Northport argues that CMS did not adequately explain the rule's alleged departure from the agency's historical support for the use of arbitration agreements by LTC facilities. Northport relies on two documents that supposedly

reflect HHS and CMS's prior policy toward arbitration agreements: a January 2003 memorandum from Steven Pelovitz, the former Director of the Survey and Certification Group of CMS, Dist. Ct. Dkt. 25-5 at 2–3 (the Pelovitz Memo), and a July 2008 letter from Michael Leavitt, the former Secretary of HHS, to the House Judiciary Committee, Dist. Ct. Dkt. 24-25 at 691–93 (the Leavitt Letter). In the Pelovitz Memo, CMS set forth its policy regarding LTC facilities that conditioned residents' admission to or ability to remain in an LTC facility on their signing of a pre-dispute, binding arbitration agreement. Noting that the agency's "primary focus should be on the quality of care actually received by nursing home residents that may be compromised by such agreements," CMS declared that it would enforce existing federal regulations to prevent LTC facilities from discharging, transferring, or retaliating against current residents who refused to enter into binding arbitration agreements. Dist. Ct. Dkt. 25-2 at 2–3. And in the Leavitt Letter, HHS articulated its general support for pre-dispute arbitration agreements as "an excellent way for patients and providers to control costs, resolve disputes, and speed resolution of conflicts." Dist. Ct. Dkt. 24-25 at 691. The agency noted its opposition to legislation that would "deprive patients and providers of the opportunity to agree voluntarily to resolve their disputes through arbitration," id., and suggested along similar lines as the Pelovitz Memo that existing regulations "provide[d] ample safeguards to ensure that nursing home residents are protected from harm," id. at 692.

To the extent the Revised Rule departs from these prior policies,[7] we find that CMS has provided a sufficiently reasonable explanation for doing so. When an agency reverses its prior policy, "it need not demonstrate . . . that the reasons for the

_____

[7]Although Northport argues that the Revised Rule departs from CMS's historical position on arbitration agreements by being *more* restrictive of the use of arbitration agreements, the Revised Rule is in fact *less* restrictive than CMS's immediately preceding policy: the Original Rule's per se ban on pre-dispute, binding arbitration agreements. See 84 Fed. Reg. at 34,719, 34,722 (noting that the "overwhelming majority of commenters" opposed the Revised Rule because it "revers[ed] course" on the Original Rule).

-24-

new policy are *better* than the reasons for the old one." Fox Television, 556 U.S. at 515. "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." Id. At the outset, we note that the Revised Rule is generally in harmony with the Pelovitz Memo and the Leavitt Letter. Indeed, the rule appreciates the advantages of arbitration and expressly permits LTC facilities and their residents to enter into arbitration agreements transparently and voluntarily. See 84 Fed. Reg. at 34,722. But even if the Revised Rule changed direction slightly by deciding that existing federal and state regulations are insufficient to protect residents' quality of care vis-á-vis arbitration agreements, CMS has provided a rational justification for that change. As noted above, CMS relied on evidence suggesting that LTC facilities' use of arbitration agreements had a larger impact on residents' health and safety than had previously been realized. CMS noted comments "rais[ing] a number of concerns that convinced us that [existing federal and state] protections are limited and do not protect the unique needs of Medicare and Medicaid beneficiaries." Id. at 34,720 (noting that "state laws differ . . . offer[ing] varying levels of protection" and that residents may not be financially capable of challenging unconscionable arbitration agreements in court, requiring CMS to step in to further safeguard residents). Relatedly, CMS determined that the five-year recordkeeping requirement was necessary to "evaluate quality of care complaints . . . and assess the overall impact of these agreements on the safety and quality of care provided in LTC facilities." Id. at 34,730.

Finally, Northport argues that the change of policy was arbitrary and capricious because it did not consider LTC facilities' "substantial reliance interests" on CMS's historical arbitration agreement policy. See Fox Television, 556 U.S. at 515 (noting that an agency may need to provide greater explanation "when its prior policy has engendered serious reliance interests that must be taken into account"). Specifically, it argues that LTC facilities have "built their economic and pricing models in reliance on the prior policy" and that the Revised Rule will require LTC facilities to

henceforth allocate more money to cover their dispute resolution costs. To begin, we echo the district court's reasonable skepticism of Northport's claimed reliance interests. Under the Revised Rule, existing arbitration agreements will continue to be enforceable, and LTC facilities can still enter into arbitration agreements with their residents and obtain federal funding so long as they comport with the rule's requirements. Therefore, the availability of arbitration and any associated cost savings are largely unaffected by the Revised Rule, and LTC facilities can continue to rely on historical economic models. But even setting that aside, we find that CMS reasonably explained the departure from CMS's prior policy in spite of those reliance interests. See Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2126 (2016) (noting that an agency need only provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy" (quoting Fox Television, 556 U.S. at 515–16)). As noted above, the Revised Rule continues to recognize the advantage of permitting LTC facilities to rely on arbitration as a fast and economic means to resolve disputes with residents. See 84 Fed. Reg. at 34,722. But CMS also explained that the cost-efficiency and expediency of arbitration had to be counter-balanced by the need to protect residents by ensuring that they enter into arbitration agreements voluntarily and in a transparent way. See id.

We conclude that the Revised Rule reflects CMS's reasoned judgment in light of competing considerations, see State Farm, 463 U.S. at 43, and we affirm the district court's conclusion that the Revised Rule is not arbitrary or capricious.

*D. Compliance with the Regulatory Flexibility Act*

Finally, Northport argues that the promulgation of the Revised Rule violated the RFA. Enacted in 1980 as a "response to the complaints of small business about the burdens of federal regulation," see Paul R. Verkuil, A Critical Guide to the Regulatory Flexibility Act, 1982 Duke L.J. 213, 226 (1982), the RFA requires an

agency undergoing informal rulemaking to prepare and publish a regulatory flexibility analysis that details, among other things, the rule's "significant economic impact on small entities" and the steps the agency has taken to minimize that impact. See 5 U.S.C. § 604; see also id. § 601(6) (defining "small entities" to include small businesses, certain non-profit organizations, and small governmental jurisdictions). However, an agency may forego the regulatory flexibility analysis "if the head of the agency certifies that the rule will not, if promulgated, have a significant impact on a substantial number of small entities." Id. § 605(b). And central to this appeal, the certification must be published in the Federal Register "along with a statement providing the factual basis for such certification." Id. In reviewing a party's claim that an agency violated the "[p]urely procedural" requirements of the RFA, Nat'l Tel. Coop. Ass'n v. F.C.C., 563 F.3d 536, 540 (D.C. Cir. 2009), we consider whether the agency made a "reasonable, good-faith effort to carry out the RFA's mandate." Zero Zone, Inc. v. U.S. Dep't of Energy, 832 F.3d 654, 683 (7th Cir. 2016) (cleaned up) (quoting U.S. Cellular Corp. v. F.C.C., 254 F.3d 78, 88 (D.C. Cir. 2001)); see Alenco Commcn's, Inc. v. F.C.C., 201 F.3d 608, 625 (5th Cir. 2000)); Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997); see also 5 U.S.C. § 611(a)(1) (permitting judicial review of a claim that an agency failed to comply with the requirements of, among other provisions of the RFA, 5 U.S.C. § 605(b)).

The parties agree that the Secretary of HHS certified that the Revised Rule would not have a significant economic impact on a substantial number of small entities. See 84 Fed. Reg. at 34,734. But Northport argues that CMS failed to provide the requisite factual basis for that certification. At first blush, it appears that Northport is correct; CMS seemingly did not provide any evidence or reasoning to support the certification, let alone make a "reasonable, good-faith effort" to do so. In publishing the final Revised Rule, CMS provided the following, cursory explanation of its decision to certify:

> The RFA requires agencies to analyze options for regulatory relief of small entities. For purposes of the RFA, small entities include small

businesses, nonprofit organizations, and small government jurisdictions. Most hospitals and most other providers and suppliers [subject to the Revised Rule] are small entities, either by nonprofit status or by having revenues of less than $7.5 million to $38.5 million in any 1 year. . . . We are not preparing an analysis for the RFA because we have determined, and the Secretary certifies, that this final rule will not have a significant economic impact on a substantial number of small entities.

Id. Considered alone, this paragraph falls short of other certifications that have passed muster. See, e.g., Carpenter, Chartered v. Sec'y of Veterans Affs., 343 F.3d 1347, 1356–57 (Fed. Cir. 2003) (upholding § 605(b) certification that clarified that the rule would not affect small businesses because it "would affect only the processing of claims by VA" (cleaned up)); Sw. Penn. Growth All. v. Browner, 121 F.3d 106, 123 (3d Cir. 1997) (upholding § 605(b) certification that explained that the rule "d[id] not affect any existing requirements applicable to small entities nor d[id] it impose new requirements").

In response, CMS argues that the required factual basis was provided in the prefatory statement to the agency's RFA certification. See 84 Fed. Reg. at 34,733–34. There, the agency noted that the Revised Rule "will increase transparency in LTC facilities that cho[o]se to use arbitration while, at the same time, allowing facilities to use arbitral forums as a means of resolving disputes." Id. at 34,734. It also explained the Revised Rule's "Overall Impact," noting that it will "ensure[] that no resident will be required to sign a pre-dispute, binding arbitration agreement as a condition for receiving the care he or she needs." Id. We struggle to see how these statements provide a factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities. Although they might describe the Revised Rule's intended effects, these statements do not even purport to consider which entities the rule will affect or to what degree.

CMS also argues that the required factual basis for the RFA certification was provided earlier in the rulemaking process. In the Original Rule, which covered

significantly more than LTC facilities' use of arbitration agreements, CMS estimated that the rule in its entirety would impact less than one percent of LTC facilities' annual revenues, an insignificant economic impact. See 81 Fed. Reg. at 68,846. Similarly, in the notice of proposed rulemaking of the Revised Rule, CMS noted that one of its proposals (ultimately amended for the final rule) would not impose significant costs or burdens on LTC facilities because it required what was already a standard business practice. See 82 Fed. Reg. at 26,652 ("We are proposing that LTC facilities post a notice regarding the use of arbitration agreements in an area that is visible to residents and visitors. . . . We believe that notices concerning facility practices are periodically developed, reviewed, and updated as a standard business practice. We also believe that facilities that are already using arbitration agreements post some type of notice. Thus, there is no burden associated with the posting of this notice.").

Yet CMS has not provided any convincing authority to suggest that an agency may satisfy its requirements under § 605(b) by relying on factual bases sprinkled throughout the Federal Register. Indeed, the plain language of the statute suggests that the certification and corresponding factual basis should be supplied by the agency in tandem. See 5 U.S.C. § 605(b) ("If the head of the agency makes a certification . . . , the agency shall publish such certification in the Federal Register . . . *along with* a statement providing the factual basis for such certification." (emphasis added)). And the cases cited by CMS do not establish that we may consider the "entire administrative record," expansively defined to include the record of a precedent rule, to determine that CMS satisfied its procedural obligations under the RFA.

For example, CMS relies upon Michigan v. Thomas to argue that we must analyze Northport's RFA claim in "the context of [CMS's] overall rulemaking analysis." 805 F.2d 176, 188 (6th Cir. 1986). But in Thomas, the Environmental Protection Agency (EPA) expressly cited in its challenged rule a previous notice that

categorically certified that rules of that type (i.e., approvals of State Implementation Plans) would not affect small entities because they stood only to approve state regulations already in place.  Id. at 187–88; see also Council for Urological Interests v. Burwell, 790 F.3d 212, 227 (D.C. Cir. 2015) (upholding certification as sufficient where HHS expressly incorporated the rule's preamble into its RFA analysis). Similarly, CMS relies upon Carpenter, Chartered v. Secretary of Veterans Affairs to argue we must assess compliance with the RFA "in view of the record as a whole," including the administrative record of the Original Rule.  343 F.3d at 1357.  But there, the Federal Circuit found that the Department of Veterans Affairs (DVA) satisfied § 605(b) because it expressly noted, when certifying that a regulatory flexibility analysis was unwarranted, that the rule would "affect only the processing of claims."  See id. at 1356 (quoting 67 Fed. Reg. at 36,104).  Moreover, the court looked to the record as a whole *not* to find whether the DVA provided a factual basis at all but rather to assess whether the DVA's certification was reasonable in light of the factual basis it provided.  See id. at 1357.  California Farm Bureau Federation v. U.S. E.P.A. is similarly not on point.  72 F. App'x 540 (9th Cir. 2003).  There, although the court mentioned in passing that the EPA's certification "was supported by [the] EPA's earlier impact analysis," it more importantly noted that the EPA provided a factual basis along with its certification that the rule would not have a significant economic impact on a substantial number of small entities.  Id. at 541 (noting that the "EPA reasoned that few agricultural operations that qualify as a small business for purposes of the Act will also qualify as a major source of pollution," the subject of the challenged regulation).

Thus, looking to the Revised Rule and the certification provided therein, we conclude that CMS failed to comply with the procedural requirements of the RFA. However, we conclude that such an error is harmless.  See Env't Def. Ctr. v. U.S. E.P.A., 344 F.3d 832, 879 (9th Cir. 2003); cf. Nat'l Mining Ass'n v. Mine Safety & Health Admin., 512 F.3d 696, 701 (D.C. Cir. 2008) (finding that the agency did not need to certify under § 605(b) that an alternative method of compliance did not create

-30-

a significant economic burden on small businesses because the agency had already determined that the *primary* method of compliance did not). "Failure to comply with the RFA may be, but does not have to be, grounds for overturning a rule." Cement Kiln Recycling Coalition v. E.P.A., 255 F.3d 855, 868 (D.C. Cir. 2001) (cleaned up). In granting relief for a violation of the RFA, we may take corrective actions, including "remanding the rule to the agency" to conduct a regulatory flexibility analysis under § 604(a) or to properly certify that such an analysis is unwarranted under § 605(b). 5 U.S.C. § 611(a)(4)(A). But such a remedy is unnecessary because, as a factual matter, the Revised Rule unquestionably has less of an economic impact than the Original Rule had.

Recall that the Original Rule entirely prohibited LTC facilities from entering into pre-dispute, binding arbitration agreements with residents. See 81 Fed. Reg. at 68,690. In promulgating the Original Rule and pursuant to the RFA, CMS certified that the entire rule—encompassing not only the arbitration prohibition but also regulations impacting, among other things, resident rights, nursing services, food and nutrition services, and infection control—would not result in a significant economic impact to LTC facilities, costing them less than one percent of their annual revenue. See 81 Fed. Reg. at 68,846; see also id. at 68,844 tbl.5 (breaking out by category the estimated costs to LTC facilities attributable to the Original Rule's regulations). In contrast, the Revised Rule *permits* LTC facilities to enter into arbitration agreements with residents so long as they meet the rule's other requirements, allowing facilities to reduce their overall costs by using arbitration as a means of dispute resolution. See 84 Fed. Reg. at 34,733–34. Accordingly, the Revised Rule *lessens* whatever financial burden was placed on LTC facilities by the Original Rule, an obvious factual basis for CMS's certification that the rule will not have a significant economic impact on a substantial number of small entities. See 5 U.S.C. § 605(b).

Therefore, although CMS failed to provide a factual basis in support of its § 605(b) certification in the Revised Rule, we conclude that failing to do so was harmless error.

## III. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of HHS and CMS.

_____